## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

AINS, INC.
806 W. Diamond Ave., Suite 400,
Gaithersburg, MD 20878,

                               Plaintiff,

        v.

DERYCK W. WEAVER II,
44103 Gala Cir.
Ashburn, VA, 20147

                               Defendant.

## COMPLAINT

Plaintiff AINS, Inc. ("AINS"), by undersigned counsel, files this Complaint for damages and injunctive relief against Defendant Deryck W. Weaver II, ("Defendant" or "Weaver"), and in support of its claim for judgment, AINS alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     AINS is a corporation formed under the laws of Maryland, with its principal place of business in Gaithersburg, Maryland.

2.     Weaver is a natural person, and an adult resident of the state of Virginia who resides in Loudoun County.

3.     Weaver is a former employee of AINS where he served as Vice President of Sales, and more recently as a Senior Account Manager.

4.     Weaver was employed by AINS from December 18, 2006 until September 31, 2014, and again from April 9, 2015 until May 6, 2016.

5.        This Court properly has subject matter jurisdiction of this suit pursuant to 28 U.S.C. § 1332, as AINS and Weaver are citizens of different states, and the amount in controversy exceeds $75,000.

6.        This Court properly has personal jurisdiction over Weaver pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(2) because Weaver contracted to, and did, provide services to AINS within the State of Maryland.

7.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as this action arises from a contract which the parties entered into in this judicial district.

## GENERAL ALLEGATIONS

### A. AINS, Inc.

8.        AINS, Inc. is a small, owner-operated software development and information technology services company headquartered in Maryland since 1988.

9.        AINS is a leader in developing cutting edge case management solutions.

10.       A "case management solution" is a software program, or application, that allows an organization to track, manage, and automate complex business processes such as fraud investigations and audits.

11.       AINS actively markets and sells its case management products to governmental, quasi-governmental, and commercial customers throughout the United States and internationally.

12.       In particular, AINS has spent a significant amount of time and effort researching and developing case management solutions to assist governmental and quasi-governmental offices, agencies, and organizations in the United States and Canada in responding to requests for information pursuant to various freedom of information laws ("FOI Case Management Solutions").

13.     The case management solution and FOI Case Management Solution markets are highly competitive, and AINS competes with a relatively small number of international and domestic companies.

14.     Purchases of FOI Case Management Solutions, such as those offered by AINS, are most often made pursuant to a competitive bidding process whereby government agencies publicly issue requests for proposals ("RFP") for particular goods or services, and AINS (and any other interested company) submits a proposal and quotation to the government by a certain deadline.

15.     These proposals and quotations generally contain confidential and proprietary information belonging to the submitting company, including, but not limited to, product specifications and pricing.

16.     The government is required to keep this information confidential, and protect it from disclosure to the submitter's competition.

17.     Pricing is almost always the most determinative factor in the government's selection of a particular competitive proposal.

18.     AINS and its competitors spend significant time and resources preparing bids in response to government solicitations, so that they may submit compelling and competitive proposals.

19.     The selection process for bids is extremely competitive, and AINS's ability to submit a competitive, cost-effective, bid is critical to its success.

3

20.     Under certain circumstances, business opportunities with government agencies may be pursued over the course of multiple years, and may require responses to multiple requests for proposal before a bid is selected.

21.     In order to secure business opportunities and submit competitive bids for goods and services, AINS has devoted, and continues to devote, significant resources to researching, developing, maintaining and upgrading its products and services, which comprise information in various forms that is confidential, proprietary, and the trade secrets of, AINS.

22.     The software programs, technology, customer lists and information, pricing information, methods, processes, marketing plans, confidential communications, and other means by which AINS conducts its business are both proprietary to, and the confidential trade secrets of, AINS, and are protectable business interests.

23.     In addition to maintaining its proprietary information and trade secrets in a secure, protected environment, AINS requires its employees, consultants, business partners, and any other individuals with a need (and only those with a need) for access to this sensitive information to execute non-competition and proprietary agreements, which include non-disclosure provisions, for the purpose of further protecting the AINS's confidential, trade secrets, and valuable customer relationships.

**B. Weaver's Employment with AINS from 2006 – 2014**

24.     Weaver worked for AINS in two different periods: he was hired by AINS in 2006 and terminated in 2014; Weaver was then rehired by AINS in 2015 and terminated again in 2016.

25.     Weaver began working as an Account Executive for AINS in December 2006, and held the following titles during his first period of employment:  Account Executive

(December 18, 2006 to November 16, 2007); Director of Business Development (November 16, 2007 to May 16, 2009); and Vice President of Sales (May 16, 2009 to September 31, 2014).

26.     Throughout his employment with AINS, Weaver's primary responsibilities included sales and business development related to AINS's case management solutions, including, but not limited to, AINS's FOI Case Management Solutions.

27.     Weaver primarily sold or attempted to sell AINS's products and services to government agencies and offices in the United States and Canada.

28.     During this time, Weaver was AINS's primary FOI Case Management Solution salesperson and a key employee.

29.     In this role, Weaver had access to AINS's confidential information and trade secrets, including but not limited to information relating to AINS case management solutions and services, as well as customer lists and information, pricing and discounting strategies, marketing plans, lobbying efforts, product specifications and roadmaps, confidential communications, and other confidential business-related materials.

30.     In order to protect this valuable information, and as a condition of his employment with AINS, on or about December 18, 2006, Weaver entered into a Non-Competition and Proprietary Agreement (the "2006 Agreement") with AINS, which precluded Weaver from disclosing AINS's confidential information or from interfering with AINS's business by soliciting its clients and/or employees during or after his employment.

31.     On September 31, 2014, Weaver's employment was terminated by AINS.

**C. Weaver's Employment with MicroPact**

32.     On December 18, 2014, Weaver accepted employment as a Federal Business Development Executive with MicroPact, Inc. ("MicroPact"), which sells case management solutions to government agencies and offices, and is a direct competitor of AINS.

33.     Weaver's start date with MicroPact was January 5, 2015.

34.     In his role, Mr. Weaver was responsible for sales and business development related to MicroPact's case management solutions and services.

35.     As a condition of Mr. Weaver's employment with MicroPact, Weaver entered into a Team Member Agreement, which precluded him from (i) disclosing MicroPact's confidential information; (ii) soliciting MicroPact's clients; or (iii) working for any competitor of MicroPact, regardless of geographic location.

36.     On January 16, 2015, upon learning of Weaver's employment with MicroPact, AINS sent letters to MicroPact and Weaver advising them of his continuing obligations pursuant to the 2006 Agreement, and providing the 2006 Agreement for review.

37.     On January 22, 2015, MicroPact terminated Weaver's employment and released him from the non-competition and non-solicitation restrictions in his Team Member Agreement.

**D. Weaver's Employment with AINS from 2015 – 2016**

38.     Following his termination from MicroPact and citing financial troubles, Weaver approached the AINS CEO and asked for his job back.

39.     On April 9, 2015, AINS rehired Weaver as a Senior Account Manager.

40.     As a condition of Weaver's re-employment with AINS, AINS required Weaver to execute a new Non-Competition and Proprietary Agreement (the "2015 Agreement" attached hereto as Exhibit A).

41.     The 2015 Agreement prohibits Weaver from disclosing AINS's confidential or proprietary information, and from competing with AINS or soliciting AINS's customers and/or employees during his employment and for 3 years thereafter.

42.     The restrictions contained in the 2015 Agreement were intended only to protect AINS's interests, and are similar in scope and duration to restrictions used by other competitors in its industry.

43.     In consideration of his prior termination from AINS and his subsequent employment with MicroPact, Weaver was also required to execute an Addendum to the 2015 Agreement whereby he promised, inter alia:

      a.   To make genuine efforts to protect AINS and its information from any action that may be detrimental to AINS's good standing;

      b.   To maintain a professional, executive-like demeanor and refrain from talking over people by unduly raising his voice; and

      c.   To work "cooperatively" with "all" AINS's resellers and channel partners and provide them with his full support.

44.     In his role as a Senior Account manager, Weaver sold and attempted to sell AINS's case management products and services, including, but not limited to, FOI Case Management Solutions to numerous domestic and international governmental and quasi-governmental customers, including but not limited to:

      a.   U.S. federal government agencies and offices, including, but not limited to the Department of Justice, Department of Agriculture, Health and Human Services, Veterans Affairs, Department of Defense and Department of Homeland Security;

     b.   Domestic state and local governments, including, but not limited to, government agencies or offices in Maryland, Virginia, the District of Columbia, Wisconsin, Georgia, Texas, Minnesota, Oregon, Indiana, Washington and Michigan;

     c.   Canadian federal, provincial, and territorial government agencies or offices, including, but not limited to, Alberta, British Columbia, Nova Scotia and Prince Edward Island, and in the city of Toronto.

45.    While employed with AINS, at AINS's expense, and in order to develop business opportunities, Weaver attended conferences and trade shows, including the annual American Society of Access Professionals ("ASAP") Training Conference, which is dedicated entirely to users and providers of FOI Case Management Solutions in the United States.

46.    In his role with AINS during this period, and in conjunction with his previous employment at AINS, Weaver obtained and utilized a deep working knowledge of AINS's cost structures and the discounting strategies AINS uses to develop competitive bids for procurements.

47.    During this time, Weaver participated in confidential internal meetings and communications discussing future releases of AINS's products, and the strategies that should be used to sell new products to existing and new customers.

48.    Weaver also developed relationships with strategic contacts at existing customers, and researched their previous procurements, as well as the customers' plans for future procurements.

49.    Weaver was also provided with access to business leads procured by AINS from third party providers.

50.     All of this information, and other types and forms obtained and used by Weaver during his employment with AINS was, and remains, confidential, and is relied upon by AINS to develop and secure business in a highly competitive market.

51.     Access to this information would provide AINS's competitors with an unfair competitive advantage and result in substantial harm to AINS.

52.     On May 5, 2016, Weaver's employment with AINS was terminated; however, the restrictions included in the 2015 Agreement, including provisions precluding Weaver from competing with AINS or soliciting AINS's customers, remain in place per the terms of the 2015 Agreement.

**E. Weaver's Employment with WebQA**

53.     On June 6, 2016, one month after his employment with AINS ended, Weaver began working for WebQA, Inc. ("WebQA") pursuant to an Independent Consultant Agreement (attached hereto as Exhibit B).

54.     WebQA was, and remains a direct competitor of AINS, as a vendor of FOI Case Management Solutions to government agencies and offices.

55.     WebQA is a leading provider of FOI Case Management Solutions to state, municipal, and local government agencies and offices in the United States, and has also sold its FOI Case Management Solution to the Department of Justice.

56.     In 2015, while Weaver was employed by AINS, he was aware that WebQA was a direct competitor of AINS, and that AINS had competed for and lost bids to WebQA.

57.     In fact, Weaver, himself, participated in confidential internal discussions at AINS as recently as November 2015 wherein WebQA was referred to as "a real competitor."

58.     Weaver began working with WebQA to advise them regarding WebQA's attempt to increase sales of their FOI Case Management Solutions to federal agencies and offices in the United States.

59.     This is the same market that Weaver sold FOI Case Management Solutions to while he was employed by AINS.

60.     Weaver was well suited for this role not only because of his experience with the sale of FOI Case Management Solutions to federal agencies and offices while at AINS, but also due to his knowledge of related to the development, customization, and marketing of FOI Case Management Solutions.

61.     This is the same knowledge and experience he had developed and utilized while employed by AINS.

62.     While working with WebQA, Weaver attended the 2016 ASAP Training Conference  and met with other conference attendees  on behalf of WebQA, just as he had while employed by AINS.

63.     At the 2016 ASAP Training Conference, WebQA provided business cards, available to conference attendees, which identified Weaver as having the title of "Federal FOIA Sales," and provided his WebQA contact information.

64.     By engaging in these activities in support of WebQA's attempt to sell FOIA Case Management Solutions, Weaver was acting in direct violation of his 2015 Agreement with AINS which expressly excluded participating in such activities on behalf of a competitor.

65.     In addition to advising WebQA regarding the sale of its FOI Case Management Solutions to federal government customers, and attending the 2016 ASAP Training Conference

on WebQA's behalf, Weaver also contacted and pursued business opportunities with certain of AINS's existing customers whose contracts were set to expire.

66.     By contacting these AINS customers, Weaver was attempting to divert their business away from AINS in violation of the non-solicitation provision of the 2015 Agreement.

67.     On July 22, 2016, after becoming aware of Weaver's Federal FOI Sales role with WebQA, AINS sent letters to Weaver and WebQA, informing them of his obligations pursuant to the 2015 Agreement, and asking them to take steps to prevent further breaches of the Agreement.

68.     On July 25, 2016, Weaver was terminated from WebQA.

**F.  Weaver's Employment with CSDC**

69.     Following Weaver's termination from WebQA, he applied for employment with multiple companies which sell case management products and services and which directly compete with AINS in the sales of FOI Case Management Solutions.

70.     One of the companies Weaver applied to was CSDC, Inc. ("CSDC"), which Weaver had identified as a FOIA software vendor.

71.     CSDC is based in Canada, and maintains several offices in the United States.

72.     CSDC develops, markets and sells case management solutions, including, but not limited to, FOI Case Management Solutions to government agencies and offices, and is a direct competitor of AINS.

73.     CSDC is a leading provider of FOI Case Management Solutions to federal and provincial government agencies and offices in Canada, including, but not limited, to the Canadian Department of Justice, the province of Nova Scotia, and the city of Toronto.

74.     CSDC has also sold its FOI Case Management Solutions to federal and state government agencies and offices in the United States, including, but not limited to, the Department of Justice, and the State of Washington.

75.     In an effort to gain employment Weaver contacted CSDC and informed them that he was interested in assisting them in the sale of its FOIA software to federal agencies and offices in the United States.

76.     On April 24, 2017, Weaver entered into an employment agreement with CSDC (attached hereto as Exhibit C).

77.     Weaver was initially hired as a Regional Director of Sales, and his responsibilities included generating business for CSDC's case management solutions, including FOI Case Management Solutions to state and federal governments in the United States.

78.     As the Regional Director of Sales for CSDC, Weaver attended the 2017 ASAP Training Conference on behalf of CSDC where he met with potential customers of FOI Case Management Solutions, just as he had previously done in support of his sales efforts for AINS and WebQA.

79.     At the 2017 ASAP Training Conference, Weaver communicated with numerous attendees, including existing and potential customers of AINS, and advised them of his new role as the Regional Director of Sales of CSDC's FOI Case Management Solutions in the United States.

80.     As part of his duties, Weaver also followed up on bids submitted by CSDC to state government agencies in Virginia and Maryland.

81.     During his employment with CSDC, Weaver also assisted and advised other CSDC sales staff in the sale of FOI Case Management Solutions to provincial governments in Canada, which he pursued while employed at AINS.

82.     As a vendor of FOI Case Management Solutions to government agencies and offices in the United States and Canada, CSDC is a direct competitor of AINS and, in fact, markets and attempts to sell its products and services to several government customers who are customers of AINS.

83.     By assisting CSDC in its efforts to sell its FOI Case Management Solutions to government agencies in the United States and Canada, Weaver was in violation of his 2015 Agreement with AINS.

84.     On information and belief, Weaver's employment with CSDC was recently terminated.

## COUNT I – BREACH OF CONTRACT
### (Work Performed for WebQA)

85.     AINS incorporates by reference paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86.     AINS and Weaver entered into a valid, binding, and enforceable contract in the 2015 Agreement.

87.     In his 2015 Agreement with AINS, Weaver promised that he would not violate the covenants, terms, and provisions enumerated therein, including those precluding him from working for a competitor of AINS engaged in the sale of case management solutions or FOIA case management solutions.

88.     By his actions described above, Weaver materially breached the 2015 Agreement with AINS by working as an independent contractor for WebQA, a direct competitor of AINS,

and by assisting and advising WebQA in its attempts to sell its FOI Case Management Solutions to federal government agencies and offices.

89.     By the material breach of his Agreement with AINS, Weaver has caused AINS substantial and irreparable injury and damages.

**COUNT II – BREACH OF CONTRACT**
**(Solicitation of AINS's Clients on behalf of WebQA)**

90.     AINS incorporates by reference paragraphs 1 through 89 of this Complaint as though fully set forth herein.

91.     AINS and Weaver entered into a valid, binding, and enforceable contract in the 2015 Agreement.

92.     In his 2015 Agreement with AINS, Weaver promised that he would not violate the covenants, terms, and provisions enumerated therein, including those precluding him from soliciting AINS existing customers.

93.     By his actions described above, Weaver materially breached the 2015 Agreement with AINS by working as an independent contractor for WebQA, and soliciting and/or pursuing business from AINS's existing clients on WebQA's behalf.

94.     By the material breach of his Agreement with AINS, Weaver has caused AINS substantial and irreparable injury and damages.

**COUNT III – BREACH OF CONTRACT**
**(Employment with CSDC)**

95.     AINS incorporates by reference paragraphs 1 through 94 of this Complaint as though fully set forth herein.

96.     AINS and Weaver entered into a valid, binding, and enforceable contract in the 2015 Agreement.

14

97.     In his 2015 Agreement with AINS, Weaver promised that he would not violate the covenants, terms, and provisions enumerated therein, including those precluding him from working for a competitor of AINS engaged in the sale of case management solutions or FOIA case management solutions.

98.     By his actions described above, Weaver materially breached the 2015 Agreement with AINS through his employment with CSDC, a direct competitor of AINS, and through his attempts to sell CSDC's FOI Case Management Solutions, and/or assist CSDC in the sale of its FOI Case Management Solutions.

99.     By the material breach of his Agreement with AINS, Weaver has caused AINS substantial and irreparable injury and damages.

### COUNT IV – BREACH OF CONTRACT
### (Solicitation of AINS's Clients on behalf of CSDC)

100.    AINS incorporates by reference paragraphs 1 through 99 of this Complaint as though fully set forth herein.

101.    AINS and Weaver entered into a valid, binding, and enforceable contract in the 2015 Agreement.

102.    In his 2015 Agreement with AINS, Weaver promised that he would not violate the covenants, terms, and provisions enumerated therein, including those precluding him from soliciting or attempting to divert the business of AINS existing and potential customers.

103.    By his actions described above, Weaver materially breached the 2015 Agreement with AINS through his employment with CSDC, and by soliciting and/or pursuing business from AINS's existing and potential customers, including, but not limited to his communications with such customers and potential customers at the 2017 ASAP Training Conference.

104.    By the material breach of his Agreement with AINS, Weaver has caused AINS

15

substantial and irreparable injury and damages.

## PRAYER FOR RELIEF

**WHEREFORE,** AINS respectfully prays for the following relief:

A.      On Count I: (1) liquidated damages in the amount of $50,000 as contractually agreed to; (2) permanent injunctive relief prohibiting Weaver from working for or on behalf of any AINS competitor in violation of the 2015 Agreement; (3) that AINS be granted the full benefit of the bargained for restrictions in the 2015 Agreement, through the extension of the restriction periods contained therein to encompass the duration agreed to in the contract; (4) an award of attorneys' fees and costs as contractually agreed to; (5) post-judgment interest at the legal rate; and (6) any other relief to AINS as this Court may deem proper.

B.      On Count II: (1) liquidated damages in the amount of $50,000 for each breach of the 2015 Agreement resulting from each occurrence of Weaver soliciting an existing or potential customer of AINS, as contractually agreed to, with the total damages to be determined at trial; (2) permanent injunctive relief prohibiting Weaver from soliciting or diverting the business of AINS's customers or potential customers in violation of the 2015 Agreement; (3) that AINS be granted the full benefit of the bargained for restrictions in the 2015 Agreement, through the extension of the restriction periods contained therein to encompass the duration agreed to in the contract; (4) an award of attorneys' fees and costs as contractually agreed to; (5) post-judgment interest at the legal rate; and (6) any other relief to AINS as this Court may deem proper.

C.      On Count III: (1) liquidated damages in the amount of $50,000 as contractually agreed to; (2) permanent injunctive relief prohibiting Weaver from working for or on behalf of any AINS competitor in violation of the 2015 Agreement; (3) that AINS be granted the full benefit of the bargained for restrictions in the 2015 Agreement, through the extension of the

restriction periods contained therein to encompass the duration agreed to in the contract; (4)an

award of attorneys' fees and costs as contractually agreed to; (5) post-judgment interest at the

legal rate; and (6) any other relief to AINS as this Court may deem proper.

     D.     On Count IV: (1) liquidated damages in the amount of $50,000 for each breach of

the 2015 Agreement resulting from each occurrence of Weaver soliciting an existing or potential

customer of AINS, as contractually agreed to, with the total damages to be determined at trial;

(2) permanent injunctive relief prohibiting Weaver from soliciting or diverting the business of

AINS's customers or potential customers in violation of the 2015 Agreement; (3) that AINS be

granted the full benefit of the bargained for restrictions in the 2015 Agreement, through the

extension of the restriction periods contained therein to encompass the duration agreed to in the

contract; (4) an award of attorneys' fees and costs as contractually agreed to; (5) post-judgment

interest at the legal rate; and (6) any other relief to AINS as this Court may deem proper.


Dated:  February 26, 2018         Respectfully submitted,


         SHULMAN ROGERS GANDAL
         PORDY & ECKER, P.A.


         By:___/s/ Gregory D. Grant_____
         Gregory D. Grant, Esq., Bar No. 13942
         12505 Park Potomac Ave, 6th Floor
         Potomac, Maryland 20854
         Tel:    301-230-5200
         Fax:    301-230- 2891
         ggrant@shulmanrogers.com

         *Counsel for Plaintiff AINS, Inc.*